VALERIE THOMPSON ENOCH, Petitioner v. ALAMANCE COUNTY DEP'T
OF SOCIAL SERVICES, Respondent

No. COA03-385

(Filed 18 May 2004)

## 1. Public Officers and Employees— county DDS—employment discrimination—nondiscriminatory reasons

The trial court did not err in an employment discrimination case by finding that respondent county department of social services articulated sufficient nondiscriminatory reasons to rebut the presumption of racial discrimination in its failure to promote petitioner to the position of program manager, because: (1) the evidence revealed that petitioner lacked the qualities specifically sought for the position as a program manager, a shortcoming not necessarily overcome by experience or education; and (2) petitioner cites no North Carolina case law to require any documentary evidence to rebut the prima facie presumption.

## 2. Public Officers and Employees— county DSS—employment discrimination—allegations of acting under pretext

The trial court did not err in an employment discrimination case by sustaining the administrative law judge's (ALJ) finding that the county department of social services (DSS) was not acting under any pretext in promoting a white male candidate instead of petitioner, an African-American female, to the position of program manager in 2001 even though the ALJ failed to consider any evidence surrounding the 1999 promotion of a white female candidate instead of petitioner, because: (1) petitioner offered no evidence linking the alleged prejudice of the prior director who did the hiring in 1999 to the prejudice of the present director; (2) the evidence surrounding the 1999 passing over of petitioner lacked sufficient probative value for inferring pretext in the present director's nondiscriminatory reasons for hiring the white male candidate; (3) the present director was not employed by the pertinent DSS at the time of the prior director's 1999 decision to promote another candidate, and the prior director was not employed by DSS at the time of the present director's decision; (4) the present director had supervised petitioner for the years of 1996-98, at no time did petitioner allege that the present director was discriminatory in her evaluations, and these evaluations were used by the present director in her 2001 hiring decision; and

(5) while experience is a factor in any promotional decision by an employer, experience initially serves as an objective criteria for minimum qualification used to limit the field of applicants and an employer is relatively free to value experience among the applicants as it sees fit in light of the skills required by the position to be filled.

**3. Public Officers and Employees— county DSS—employment discrimination—administrative appeal scheme—due process**

The administrative appeal scheme which routed the recommended decision of the Administrative Law Judge (ALJ) and the State Personnel Commission (SPC) finding no racial discrimination in an employment decision back to the Local Appointing Authority (LAA) for the final decision did not violate the employee's due process rights because, under N.C.G.S. §§ 126-37(b1) and 150B-36, the LAA will not have an opportunity to reverse a finding of discrimination by the SPC; the LAA must affirm an SPC finding that there was no discrimination unless the finding is clearly contrary to the preponderance of the admissible evidence, giving due regard to the opportunity of the ALJ to evaluate the credibility of the witnesses; in her final agency decision, the LAA adopted the detailed findings of fact of the ALJ, as adopted without exception by the SPC, pursuant to the deferential standard after the ALJ had determined the credibility of her testimony; and the LAA's additional administrative review outweighed any potential risk of bias.

**4. Public Officers and Employees— county department of social services—employment discrimination—rational basis**

The trial court did not err by adopting without exception the administrative law judge's (ALJ) opinion finding that petitioner African-American female lacked sufficient evidence to prove employment discrimination in the decision by the director of a county department of social services to promote a white male in 2001 to the program management position instead of petitioner even though petitioner contends the ALJ's decision lacked substantial evidence or was arbitrary and capricious under the whole record test, because there was a rational basis in the record to affirm the decision.

Judge WYNN dissenting.

Appeal by petitioner from order entered 18 November 2002 by Judge James C. Spencer, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 2 December 2003.

*McSurely & Osment, by Alan McSurely, for petitioner appellant.*

*Office of the County Attorney of Alamance County, by David I. Smith; and Adams, Kleemeier, Hagan, Hannah & Fouts, by Brian S. Clarke, for respondent appellee.*

McCULLOUGH, Judge.

On 23 February 2001, petitioner appellant, Ms. Valerie Enoch (Ms. Enoch), filed a petition for a contested case hearing pursuant to N.C. Gen. Stat. § 126-34.1 (2003) with the Office of Administrative Hearings (OAH). Ms. Enoch's petition alleged that in February of 2001 respondent appellee, Alamance County Department of Social Services (DSS), failed to promote her to the position of "Social Work Program Manager" based on her race (African-American), her sex, and was the result of retaliation.

Ms. Enoch's contested case was heard before Administrative Law Judge Melissa Owens Lassiter (ALJ) on 14, 17, and 21 August 2001. The ALJ's recommended decision, based on 110 findings of fact and 86 conclusions of law, held that DSS's decision not to promote Ms. Enoch was made without discrimination. The State Personnel Commission (SPC) reviewed the ALJ's decision, and after rejecting exceptions made by petitioner, recommended the Local Appointing Authority (LAA) adopt the ALJ's findings of fact and conclusions of law in full. The LAA, Ms. Susan Osborne, Director of Alamance County DSS, followed the recommendation of the SPC. Upon judicial review, the adoption of the ALJ's findings of fact and conclusions of law by the SPC and LAA was sustained, bringing the issue now before this Court.

## I. Background

This litigation is based upon the following facts of record: Ms. Enoch is an African-American woman. In both 1999 and 2001 she was denied promotion to program manager in DSS. For the 1999 position, a white female, Ms. Linda Allison, was hired but did not meet the minimum qualifications for the position. Mr. Edward R. Inman, DSS's director at the time, hired the under-qualified applicant despite being informed by Ms. Dianne Gallimore, DSS's fiscal and personnel director at the time, that Ms. Enoch was the only applicant that met the minimum qualifications for the position.

ENOCH v. ALAMANCE CTY. DSS

[164 N.C. App. 233 (2004)]

· Ms. Enoch and her husband met with Mr. Inman to discuss his decision. At this meeting, neither Mr. Inman nor Ms. Gallimore disclosed to Ms. Enoch that she was the only qualified applicant for the position. Ms. Enoch alleged that race had something to do with the decision, to which Mr. Inman responded, "You people always tend to want to believe that there's some race involved, there was no—that there's discrimination involved. There was no race involved in this decision." Though Mr. Enoch pointed out the racist nature of this statement, Mr. Inman made another comment in the same vein before the meeting was ended. Mr. Inman later sent Ms. Enoch a letter, dated 21 June, 1999, explaining his decision in greater detail. Petitioner did not further appeal this hiring decision. At the end of 1999, Mr. Inman retired. Ms. Susan Osborne was hired to replace Mr. Inman as Director of DSS.

On or about 12 December 2000, DSS posted an in-house notice for a newly created program management position. Three DSS employees submitted applications for the position: Ms. Enoch, Mr. Phillip Laughlin, and Ms. Alexa Jordan. All three applicants met the minimum qualifications for the position. Ms. Osborne, who conducted the hiring process, considered a number of factors in making her selection: (a) structured interview; (b) previous evaluations; (c) input from her management team regarding interactions with the applicants; (d) input from the subordinates of each applicant; (e) the DISC profile of each applicant; (f) the experience and educational backgrounds of each applicant; and (g) consultation with DSS's human resources contact.

## II. The Selection Process

### A. Structured Interview

The structured interviews of the three applicants conducted by Ms. Osborne included ten questions based upon the requirements of the program management position. After the interviews, Ms. Osborne ranked each applicant, serving as the basis for her circling of "hire," "hire with reservation," or "would not hire" on her interview evaluation form. Ms. Osborne circled "would not hire" for Ms. Enoch, "hire with reservations" for Mr. Laughlin, and "hire" for Ms. Jordan.

### B. Previous Evaluations

Ms. Osborne reviewed previous evaluations of Ms. Enoch in her position as Social Worker Supervisor III. These annual evaluations were all similar in form, with areas of performance rated as "exceeds

expectations," "meets expectations," or "partially meets expectations." Ms. Osborne herself supervised Ms. Enoch from 1996-1998. In the 1996 evaluation, Ms. Osborne gave Ms. Enoch only a "partially meets expectations" in the area of initiative. In the 1997 evaluation, Ms. Enoch was given "partially meets expectations" in categories of productivity and initiative. Additionally, in the managerial/supervisor supplement to the 1997 evaluation, Ms. Osborne stated, "Reorganization is complete and Valerie [Ms. Enoch] now needs to take more of a leadership role in terms of outcomes, case plans and case resolution . . . . Valerie needs to take more initiative with her staff in leading them towards case resolution." In her last evaluation by Ms. Osborne, Ms. Enoch was again given a "partially meets expectations" in the area of initiative, stating this area "continues to need improvement." Again, in the managerial/supervisor supplement to the 1998 evaluation, Ms. Enoch was given a "partially meets expectations" in the area of supervision direction. Ms. Osborne stated, "more of a leadership role in terms of outcomes, case plans and case resolutions is needed of a supervisor at this level."

The evaluations of Ms. Enoch for 1999, 2000, and 2001 were not conducted by Ms. Osborne, but by Mr. Inman and Ms. Allison. Their evaluations rated her as "meeting" or "exceeding" expectations in all areas. Ms. Osborne testified before the ALJ that Mr. Laughlin's prior evaluations had less "partially meets expectations" than the ratings for either Ms. Enoch or Ms. Jordan. Ms. Enoch put on no evidence to dispute this.

Using DSS's new county-wide evaluation form, on 24 October 2000 Ms. Enoch received an overall rating percentage of 68.75%, meaning she out-performed that percent of Alamance County employees. Mr. Laughlin received a rating of 57.60%.

*C. Input from Management*

Also used as criteria in the selection process was input Ms. Osborne gathered from her management team. The team was composed of Ms. Osborne, Ms. Gallimore, Marianne Putnam, Caroline Davis, Rebecca Grindstaff, and Betty Joyce. These women all had individual working relationships with the applicants.

In Ms. Davis's testimony before the ALJ, she stated that in her working relationship with Ms. Enoch, she would need to coordinate with Ms. Enoch or her team about every six weeks. Ms. Davis testified that there was difficulty in getting required information from Ms. Enoch or her team:

[M]y staff would come to me and say, "I can't get the information. I can't get the worker to call me back. I've called Ms. Enoch. She hasn't returned my call." And then at that point, I would become involved trying to contact Ms. Enoch and—and say, you know, "we need this information so that we can work this case."

She testified further, referring to Mr. Laughlin and Ms. Jordan, "Generally, the other two would have—would provide me with what I needed."

On cross-examination, Program Manager Ms. Allison (who took the position in 1999 for which Ms. Enoch also applied) testified from her memory as to what her concerns were about Ms. Enoch for the position:

I had concerns that perhaps she did not get outside of the office enough, outside of her own team enough, outside of Children's Services enough and had concerns about her overall ability perhaps to see the big picture of the Agency, knowing that we were working on some collaborative initiatives that required all the units to mesh and to interact and that type thing.

Ms. Allison's positive input pertaining to Mr. Laughlin was as follows:

I felt that Mr. Laughlin was very strong in the Agency, in his relations with people from all different departments. He had a strength for being able to get to know folks and work with other people in a collaborative way. He also had strengths outside of the Agency, and was just very personable.

D. *Input from Subordinates*

Also used as criteria in the selection process was input Ms. Osborne received from the applicants' subordinates. Adrian Daye, an African-American woman and a social worker who had been supervised by both Ms. Jordan and Ms. Enoch, testified before the ALJ. Ms. Enoch supervised Ms. Daye during two different times, at first for nine months, and again for approximately a year. When asked about Ms. Enoch's drawbacks, she opined:

I stated that—and—and I don't know if—I guess it depends on who's looking if there are drawbacks. I stated that the second time I had her, that my supervision was kind of me going to her when I needed her. It was me—if I had a question, you know, I went to her.

I talked about how if you—I guess if you look at Ms. Jordan, who was out there in the community, she—you know, she was on different committees and righting [sic] grants. You know, those—those were things that Ms.—I didn't see Ms. Enoch doing as well.

*F. DISC Profile*

Ms. Osborne considered the DISC profile of each of the three applicants. The DISC stands for Dominance Influence Steadiness Conscientiousness, and it describes behavioral patterns in terms of these four tendencies when implicated in work-related scenarios. Ms. Osborne had the three applicants fill out a 32 factor "Role Behavior Analysis" which highlighted the duties, characteristics, and strengths needed in the program management position. Eight to ten of these 32 areas were considered "critical." In the critical areas, Ms. Jordan scored the highest, Mr. Laughlin second, and Ms. Enoch third. Ms. Osborne discussed the results of these profiles with each applicant, and Ms. Enoch informally agreed that the DISC profile accurately summarized her style and tendencies.

Additionally, using similar information, Ms. Osborne and Ms. Allison, also taking the DISC profile, considered the DISC analysis of each applicant to show which would be the best fit with their DISC profiles. This was called the "Personal Profile System Graph," or "fit analysis." Based on the fit analysis of the three applicants, Mr. Laughlin was the closest fit, followed by Ms. Jordan, and then Ms. Enoch.

*G. Experience and Educational Background*

In her consideration of the experience and education of each applicant, Ms. Osborne estimated in her testimony that this constituted approximately 15% of the basis of her overall hiring decision. There is no clear estimate as to the distribution of the other 85% as to forming the basis of her hiring decision.

To Ms. Osborne's understanding, at the time her hiring decision was made, each applicant had the following educational background: Ms. Enoch held a Bachelor of Arts degree in psychology from Duke University; Mr. Laughlin held a Masters of Arts degree in counseling from North Carolina Central; and Ms. Jordan held an undergraduate degree in education, a Masters degree, and a Juris Doctorate (J.D.) degree. Ms. Enoch and Mr. Laughlin had the following experience: Ms. Enoch had been employed by DSS for approximately 20 years, holding a supervisory position for approximately 7-1/2 years; Mr.

Laughlin had been employed by DSS for 8 years, holding a supervisory position for approximately 2 years and 9 months.

### H. Human Resources

Before making her final decision, Ms. Osborne consulted DSS's Human Resources contact, Ms. Joanne Garner. Ms. Osborne told Ms. Garner of the selection process she had followed, some of the information she gathered about the applicants, and that she was leaning towards Mr. Laughlin. Ms. Garner advised Ms. Osborne that she concurred with Ms. Osborne's selection process, and her proposed selection.

## III. The Selection

After the selection process had been concluded, but before her decision was made, Ms. Osborne listed several qualities that she wanted in a program manager. These included: an applicant should be someone with vision and people skills who could take ideas and delegate in carrying them through; who would establish public relations within the agency and the community; who would be a team builder; who would see the big picture and be open-minded to change; have good communication skills, be a good "fit" with management, and be able to follow through.

She then compared the strengths and weaknesses of each candidate. For the strengths of Ms. Enoch, Ms. Osborne listed: "longevity" and "program knowledge"; for her weaknesses, Ms. Osborne listed: "little initiative," "motivation," "no vision," "reactionary," "lack of community work," "doesn't respond well to calls," and "confrontational." For the strengths of Mr. Laughlin, Ms. Osborne listed: "relationships in agency good," "visionary," "likes change," "shows improvement when constructive [sic] criticism," "invites feedback," "communication skills," "talks the talk/right philosophy," "support from management," and "fit analysis choice"; for his weakness, Ms. Osborne listed: "perception poor in CS," "low self-confidence," "less experience than other applicants," and "can seem defensive." This list was further fleshed out in her testimony before the ALJ.

Ms. Osborne chose Mr. Laughlin on the alleged basis that he possessed the desired attributes, characteristics, and demonstrated the skills needed for the position. Ms. Garner concurred with Ms. Osborne's choice. Upon the selection of Mr. Laughlin, Ms. Enoch believed her race was the reason for being passed over again for the program management position. However, Ms. Enoch admitted in her

testimony before the ALJ that she told Ms. Osborne that had Ms. Jordan been selected, a white female, no grievance would have been filed. Ms. Enoch believed Ms. Jordan to have more "comparable skills" to herself than Mr. Laughlin.

## IV. Issues on Appeal and Applicable Law

### A. Standard of Review

Pursuant to those errors addressed in Ms. Enoch's brief, we review the ALJ's opinion, as adopted without alteration by the SPC, LAA, and trial court, for errors of law, violations of constitutional provisions, and whether the decision was arbitrary and capricious or an abuse of discretion; all other errors we deem abandoned. N.C. Gen. Stat. § 150B-51 (2003); *Shackleford-Moten v. Lenior Cty. DSS*, 155 N.C. App. 568, 572, 573 S.E.2d 767, 770 (2002), *disc. review denied*, 357 N.C. 252, 582 S.E.2d 609 (2003); N.C.R. App. P. 10(a); N.C.R. App. P. 28(a). As for alleged errors of law and constitutional implications, we review Ms. Enoch's contentions *de novo. N.C. Dep't of Health and Human Servs. v. Maxwell*, 156 N.C. App. 260, 264, 576 S.E.2d 688, 691 (2003). As for the alleged arbitrary and capricious or abuse of discretion nature of the ALJ's findings of fact and conclusions of law, we apply the "whole record" test. *Powell v. N.C. Dept. of Transportation*, 347 N.C. 614, 623, 499 S.E.2d 180, 185 (1998).

### B. Errors of Law

Ms. Enoch alleges the ALJ's application of North Carolina race discrimination law was in error pursuant to N.C. Gen. Stat. §§ 126-16 and 126-36 (2003) and *Dept. of Correction v. Gibson*, 308 N.C. 131, 301 S.E.2d 78 (1983). Specifically, Ms. Enoch contends that after she made her *prima facie* case for discrimination under *Gibson* (discussed infra) creating a presumption of discrimination, the ALJ erroneously decided DSS met its burden to rebut and dispel the presumption. We disagree, and conclude that DSS carried its burden.

### 1. The Law

Under N.C. Gen. Stat. §§ 126-16 and 126-36 (2003), it is unlawful for an employer to deny an employee subject to the State Personnel Act promotion based on the employee's race or gender. Our Supreme Court has adopted the United States Supreme Court's "burden shifting" scheme set out in the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668 (1973). *Gibson*, 308 N.C. at 141, 301 S.E.2d at 85 (stating the ultimate purpose of N.C. Gen. Stat. § 126-36 and Title

VII (42 U.S.C. 2000(e), *et seq.*) is the same). Pursuant thereto, "we look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." *Gibson*, 308 N.C. at 136, 301 S.E.2d at 82. Furthermore, the Court in *Gibson* stated that in properly applying the burden-shifting scheme the " 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains *at all times* with the plaintiff.' " *Id.* at 138, 301 S.E.2d at 83 (1983) (emphasis added) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 215 (1981)).

The burden to establish a *prima facie* case under *McDonnell Douglas* and *Gibson* is not an onerous one, but is as follows: (1) plaintiff is a member of a minority group; (2) she was qualified for a promotion; (3) she was passed over for the promotion; and (4) the person receiving the promotion was not a member of a protected class. *Gibson*, 308 N.C. at 137, 301 S.E.2d at 82-83; *Alvarado v. Board of Trustees*, 928 F.2d 118, 121 (4th Cir. 1991); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 147 L. Ed. 2d 105, 116 (2000). After a *prima facie* case is made, a presumption arises that the State unlawfully discriminated against the plaintiff. *Gibson*, 308 N.C. at 138, 301 S.E.2d at 83. To dispel this presumption, the State then has the burden of production, stated in *Gibson* as:

> [T]o rebut the presumption of discrimination, the employer must clearly explain by admissible evidence, the nondiscriminatory reasons for the employee's rejection or discharge. The explanation must be legally sufficient to support a judgment for the employer.

*Id.* at 139, 301 S.E.2d at 84. If the State is able to produce such nondiscriminatory reasons, the plaintiff must then show by a preponderance of the evidence that the proffered explanation by the State is pretextual in nature, and that the employer intentionally discriminated. *Id.* at 138, 301 S.E.2d at 83. The plaintiff can reuse evidence from their *prima facie* showing to assist in carrying their burden as to pretext though the *prima facie* presumption has been dispelled. However, the Court is "not at liberty to review the soundness or reasonableness of an employer's business judgment when it considers whether alleged disparate treatment is a pretext for discrimination." *Id.* at 140, 301 S.E.2d at 84. The sole question is what is the motivation behind the employer's decision. *Id.* at 141, 301 S.E.2d at 85. In other words, " '[i]t is not enough . . . to *dis*believe the employer; the factfinder must

*believe* the plaintiff's explanation of intentional discrimination.' " *Reeves*, 530 U.S. at 147, 147 L. Ed. 2d at 119 (emphasis in original) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 125 L. Ed. 2d 407, 424 (1993)).

### 2. *Applying the Law*

#### a. *Rebutting the Presumption of Discrimination*

[1] Neither party in this case disputes that the *prima facie* case has been met, and therefore we begin our analysis with the presumption that DSS's choice of Mr. Laughlin over Ms. Enoch was discriminatory. To rebut this presumption, the ALJ cited the burden of production as: "[DSS] must explain its legitimate non-discriminatory reason(s) for its decision by admissible evidence sufficient to support a judgment for Respondent."

Ms. Enoch contends this citation of DSS's burden was in error, as the court left out the adverbs "clearly," modifying "explain," and "legally," modifying "sufficient," from the standard set out in *Gibson*. In light of other statements made by our Supreme Court in *Gibson*, we conclude the omission of these adverbs is immaterial. Specifically, that Court stated:

> [T]he employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons. The employer is not required to prove that its action was actually motivated by the proffered reasons for it is sufficient if the evidence raises a genuine issue of fact as to whether the claimant is a victim of intentional discrimination.

*Gibson*, 308 N.C. at 138, 301 S.E.2d at 83. *Gibson* clearly states that DSS need only raise a *genuine issue of fact* to rebut the presumption of discrimination, a burden of production sufficiently set forth in the standard used by the ALJ in this case. *See also Brewer v. Cabarrus Plastics, Inc.*, 130 N.C. App. 681, 687, 504 S.E.2d 580, 584 (1998), *disc. review denied*, 350 N.C. 91, 527 S.E.2d 662 (1999); *Maxwell*, 156 N.C. App. at 263-64, 576 S.E.2d at 691.

Ms. Enoch next argues that DSS did not meet the standard set forth in *Gibson* to rebut the presumption of discrimination. Ms. Enoch states the testimonies of Ms. Osborne, Ms. Gallimore, Ms. Davis, and Ms. Daye were the only admissible evidence used to rebut the presumption of discrimination, and alleges they lacked credibility. Further, Ms. Enoch argues that there was no documentary evidence to verify the credentials of Mr. Laughlin.

In *Gibson*, an African-American man, holding the position of a Correctional Program Assistant I (CPA I), was fired after an inmate escaped from a youth center during his watch. During the 5 years preceding the incident, there had been 119 escapes from the youth center. In making his *prima facie* case, Gibson alleged other white employees had been just as negligent in their job performance as he had been, and that he was fired because of his race. The Department of Correction (DOC) met their burden to rebut the presumption of discrimination with the testimony of Superintendent F.B. Hubbar who provided the sole evidence that the nondiscriminatory reason for Gibson's termination was that Gibson's negligence was greater than his fellow white CPAs. *Id.* at 142, 301 S.E.2d at 85. The Court found this sufficient to raise a genuine issue of fact, and required Gibson to move forward with his burden of showing pretext by a preponderance of the evidence. *Id.*

Here, DSS articulated sufficient nondiscriminatory reasons to rebut the presumption of discrimination. Ms. Osborne, who made the ultimate hiring decision, gave thorough and detailed testimony as to why she choose Mr. Laughlin. Specifically, she listed the desirable qualities of a program manager to be that of a visionary who is progressive and flexible. There is sufficient evidence that Ms. Enoch had less of these attributes than the other applicants. Ms. Osborne testified as to the three annual evaluations in which Ms. Enoch was found to lack a desired level of initiative; Ms. Davis's testimony raises a genuine issue of fact as to Ms. Enoch's communication skills and ability to work effectively with various areas within the agency; and Ms. Daye's testimony raised a genuine issue of fact as to Ms. Enoch's ability to extend beyond the agency into the community. We think this is more than enough to rebut a presumption of discrimination as these testimonies allege facts that Ms. Enoch lacked the qualities specifically sought in a program manager, a shortcoming not necessarily overcome by experience or education. Furthermore, Ms. Enoch cites no North Carolina case law to require any "documentary evidence" to rebut the *prima facie* presumption. Our Supreme Court in *Gibson* found the oral testimony of the employer, who recommended Gibson's termination to be sufficient to dispel the presumption. Likewise, we find DSS produced evidence sufficient to do so in this case. *Gibson*, 308 N.C. at 142-43, 301 S.E.2d at 85-86.

### b. *Evidence of Pretext*

[2] Ms. Enoch alleges the court erred in sustaining the ALJ's finding that DSS was not acting under any pretext in promoting Mr. Laughlin,

as the ALJ failed to consider evidence surrounding the 1999 promotion of Ms. Allison. We disagree.

When considering evidence of pretext, *Gibson* states:

We believe it helpful to note some of the factors which courts have considered as relevant evidence of pretext. They are:

(1) Evidence that white employees involved in acts against the employer of comparable seriousness were retained or rehired,

(2) Evidence of the employer's treatment of the employee during his term of employment,

(3) Evidence of the employer's response to the employee's legitimate civil rights activities, and

(4) Evidence of the employer's general policy and practice with respect to minority employees.

*Gibson*, 308 N.C. at 139-40, 301 S.E.2d at 84; *see also McDonnell Douglas*, 411 U.S. 792, 36 L. Ed. 2d 668; *Abron v. N.C. Dept. of Correction*, 90 N.C. App. 229, 231, 368 S.E.2d 203, 205 (1988). Establishing the probative value of evidence is a determination best made by the administrative body. *Maxwell*, 156 N.C. App. at 263-64, 576 S.E.2d at 691; *see Johnson v. Runyon*, 928 F. Supp. 575 (D. Md. 1996), *aff'd*, 151 F.3d 1029 (4th Cir. Md. 1988). In *Johnson*, the District Court of Maryland found it was not significantly probative to infer discrimination in a decision made in 1990 from alleged discriminatory conduct by that same decision maker in 1994. *Id.* Similarly, in *Ambush v. Montgomery Cty. Government, etc.*, 620 F.2d 1048 (4th Cir. Md. 1980) the plaintiff in that case argued there was pretext by the employer due to an argument plaintiff had with a fellow white employee. The court found the argument inconclusive evidence of discrimination when it was conclusively established that the person against whom bias presumably was asserted, was not the person who made the selection of the unit to which the promotion was assigned or of the employee to be promoted in that unit. *Id.*

In conclusion of law no. 60, the ALJ stated that evidence of Mr. Inman's racial animus "may not be used to establish" pretext. While this conclusion of law is erroneous under *Gibson*, the record shows that it was not prejudicial in this case because the ALJ did in fact consider this evidence of treatment during Ms. Enoch's term of employment. *Gibson*, 308 N.C. at 139-40, 301 S.E.2d at 84. In her findings of

fact nos. 3-28, the ALJ considered Mr. Inman's decision to promote Ms. Allison to the management position in 1999 despite the fact that she did not meet the minimum qualifications for the position. Additionally, the ALJ considered the discussion as to why Ms. Enoch was passed over, and that Mr. Inman twice referred to Mr. and Ms. Enoch as "you people," referring to their race.

However, Ms. Enoch offered no evidence linking the alleged prejudice of Mr. Inman to the decision of Ms. Osborne. Thus, also in conclusion of law no. 60, the ALJ was correct in concluding that the evidence surrounding the 1999 passing over of Ms. Enoch lacked sufficient probative value for inferring pretext in Ms. Osborne's nondiscriminatory reasons for hiring Mr. Laughlin. Ms. Osborne was not employed by Alamance County DSS at the time of Mr. Inman's 1999 decision to promote Ms. Allison; Mr. Inman was not employed by DSS at the time of Ms. Osborne's decision to promote Mr. Laughlin. Furthermore, Ms. Osborne had supervised Ms. Enoch for the years of 1996-98. At no time did Ms. Enoch allege that Ms. Osborne was discriminatory in her evaluations, and these evaluations were used by Ms. Osborne in her 2001 hiring decision. Based upon the evidence before the ALJ, any inference of prejudice surrounding the 1999 promotion did not extend to Ms. Osborne's 2001 decision.

Also on the issue of pretext, Ms. Enoch next contends that her superior qualification over Mr. Laughlin was evidence of a discriminatory pretext. She argues that the ALJ misunderstood the principles of our holding in *N.C. Dept. of Correction v. Hodge*, 99 N.C. App. 602, 394 S.E.2d 285 (1990), and therefore was in legal error in failing to apply it. Ms. Enoch interprets *Hodge* in light of the State Personnel Rule that "selection for applicants for promotion will be based on a relative consideration of their qualifications" and "advantage will be given to applicants determined to be best qualified." 25 N.C. Admin. Code tit. 11.1905(a). She states in her brief that *Hodge* requires that where an agency uses subjective criteria, such as performance in an interview, the objective qualifications must carry more weight than these criteria. However, we find no such holding in our reading of *Hodge*.

In *Hodge*, the ALJ found, and the SPC sustained with additional conclusions, that the State had discriminated in promoting a white applicant over an African-American. Applying the deferential whole record test on the issue of whether Mr. Hodge was better qualified, we affirmed that the record supported the Commission's conclusion that he was more qualified. The Court in *Hodge* held that the sole selection

criteria used by DOC in that case was a subjective interview by a three-member hiring commission. Mr. Hodge had an overwhelmingly greater amount of experience, had scored higher on an eligibility examination, and was only a point behind the white applicant chosen on 14 of the 15 individual interview scores.

In the instant case, there was no single criteria used in Ms. Osborne's selection process, and she in fact used a number of different sources to generate information as to the skills and experience of each applicant. Of the evidence before the ALJ, the only areas in which Ms. Enoch clearly surpassed the other applicants were her work experience (20 years compared to Mr. Laughlin's 8), and the number of years as she had been a supervisor (7-1/2 years compared to Mr. Laughlin's 2 years and 9 months). However, in light of the diverse criteria and sources sought by Ms. Osborne in making her decision, these objective factors become less determinative. Ms. Enoch did not carry her burden in rebutting evidence as to the other areas used in making Ms. Osborne's determination. Therefore, *Hodge* is distinguishable on the issue of an applicant's objective qualifications.

To hold that *Hodge* compels this Court, as a matter of law, to find that Ms. Enoch's superior experience over the other applicants is determinative and absolute would have the effect of subverting otherwise genuine and thorough application processes seeking the best applicant for a particular position. Fairness to both applicants for promotion and employers requires more than a comparison of objective factors. *See Thompson v. McDonnell Douglas Corp.*, 416 F. Supp. 972, 982 (E.D. Mo. 1976). SPC regulations recognize that objective factors are only one source for filling positions with the best applicants:

> The training and experience requirements serve as indicators of the possession of the skills, knowledges, and abilities which have been shown through job evaluation to be important to successful performance, and as a guide to primary sources of recruitment. It is recognized that a specific quantity of formal education or numbers of years experience does not always guarantee possession of the necessary skills, knowledges, and abilities for every position. Qualifications necessary to perform successfully may be attained in a variety of combinations.

N.C. Admin. Code. § 1I.1905(b)(2) (2001). This subsection addresses the *minimum qualification* of applicants. While experience will of

course be a factor in any promotional decision by an employer, experience initially serves as an objective criteria for minimum qualification used to limit the field of applicants. Beyond this use, we conclude an employer is relatively free to value experience among the applicants as it sees fit in light of the skills required by the position to be filled. This freedom is of intrinsic value to the hiring process and business judgment of decision makers.

### C. Violation of Due Process

[3] Ms. Enoch contends the administrative appeal scheme of Chapter 150B routing the recommended decision of the ALJ and SPC back to the LAA, Ms. Osborne, for the final decision, is unconstitutional. Specifically, Ms. Enoch claims her due process rights were violated because Ms. Osborne, the decision maker in hiring Mr. Laughlin, made the final administrative determination as to whether her own decision was discriminatory. We conclude that the facts presenting this issue before us do not implicate due process concerns, and we refrain from making any determination as to the overall constitutionality of the administrative appeals scheme.

Where an employer is a county department of social services, the "local appointing agency [LAA] is the director of the department." N.C. Gen. Stat. § 108A-9 (2003); In Re Brunswick County, 81 N.C. App. 391, 397, 344 S.E.2d 584, 586 (1986). N.C. Gen. Stat. § 126-37(b1) (2003) provides as follows:

[E]xcept in appeals in which discrimination prohibited by Article 6 [of Chapter 126] is found . . . the decision of the State Personnel Commission shall be advisory to the local appointing authority. . . . The local appointing authority, shall within 90 days of receipt of the advisory decision of the State Personnel Commission, issue a written, final decision either accepting, rejecting, or modifying the decision of the State Personnel Commission. If the local appointing authority rejects or modifies the advisory decision, the local appointing authority must state the specific reasons why it did not adopt the advisory decision.

The substance of this is repeated in N.C. Gen. Stat. § 150B-23(a) (2003). Should the situation arise, there are no statutory alternatives when the LAA might desire to recuse herself or if she is disqualified from making the final decision. See Hearne v. Sherman, 350 N.C. 612, 620, 516 S.E.2d 864, 869 (1999) (Martin, J., dissenting), reh'g denied, 351 N.C. 122, 558 S.E.2d 196 (1999).

Ms. Enoch cites *Hearne* for guidance, though the opinion lacks any precedential value. In *Hearne*, a Court of Appeals unpublished opinion found no due process violation where a county health department director allegedly asked an employee to resign without proper cause. Upon review of the ALJ and SPC's findings that the director had in fact fired the employee without cause, the director (and LAA) chose not to adopt the SPC's recommended decision. He did so upon the determination that his own testimony was credible stating that the employee had resigned. We reversed the trial court's determination that the LAA's decision lacked substantial evidence of record, and reinstated the LAA's decision. In a three-to-three decision rendered by our Supreme Court (one justice not participating), our decision was affirmed without precedential value and with three justices finding due process violations in the administrative scheme. *Hearne*, 350 N.C. 612, 516 S.E.2d 864.

In the case of discrimination, the provisions of N.C. Gen. Stat. § 126-37(b1) and N.C. Gen. Stat. § 150B-36 provide that when the SPC makes a finding of discrimination, this is binding upon the LAA. At that point, the administrative process stops, and the case is then subject to judicial review. Therefore, the due process concerns raised in *Hearne* are not as strong in discrimination cases because the LAA will never have an opportunity to reverse a finding of discrimination by the SPC (i.e., an LAA can never find him or herself to be credible for the purpose of reversing a finding of discrimination). As in this case, the LAA still makes the final decision to affirm the SPC on a finding that there was no discrimination, but they are compelled to do so "unless the finding[s] are clearly contrary to the preponderance of the admissible evidence, giving due regard to the opportunity of the [ALJ] to evaluate the credibility of witnesses." N.C. Gen. Stat. § 159B-36(b). If a discrimination case reaches the LAA, it will only be after the ALJ or SPC has determined the credibility of witnesses. The LAA will never be in a position to find him or herself credible for the purposes of *not* adopting an SPC decision finding discrimination.

In her final agency decision, Ms. Osborne adopted the very detailed findings of fact of the ALJ, as adopted by the SPC without exception. She did so under the deferential standard of N.C. Gen. Stat. § 150B-36(b), after the ALJ had determined the credibility of her testimony. The record supports the ALJ's findings, which were generated from a full hearing before an impartial tribunal after proper notice had been issued. While we acknowledge there is a potential risk of bias by Ms. Osborne in making the final agency decision as to

discrimination in her own decision, we hold that, for due process purposes in discrimination cases, this risk is outweighed by affording Ms. Enoch another tier of administrative review.

Our concern, however, as was Justice Martin's in his dissent in *Hearne*, is the lack of statutory alternatives when a party files an affidavit for personal bias pursuant to N.C. Gen. Stat. § 150B-36. Justice Martin stated, "I note, and the majority does not disagree, that the [APA] does not provide for an alternative or substitute arbiter in the event of [the LAA's] recusal. Therefore, any attempt by petitioner to request that [the LAA] recuse himself would have . . . been 'clearly useless[.]' " *Hearne*, 350 N.C. at 620, 516 S.E.2d at 869 (Martin, J., dissenting). Because there is no statutory alternative, the LAA must render the final agency decision as a matter of necessity despite potential bias. *Bacon v. Lee*, 353 N.C. 696, 717-18, 549 S.E.2d 840, 854-55 (Governor of North Carolina permitted to consider death row clemency petition despite his prior tenure as Attorney General), *cert. denied*, 533 U.S. 975, 150 L. Ed. 2d 804 (2001); *Long v. Watts*, 183 N.C. 99, 102, 110 S.E. 765, 767 (1922) (Court must hear case challenging application of statewide income tax to judicial salaries, despite the potential impact of decision on members of the Court).

Ms. Enoch filed such an affidavit of personal bias, and Ms. Osborne denied it in her final agency decision, stating "it to be obvious, apparent, and self-serving." This determination was in accord with N.C. Gen. Stat. § 150B(36), requiring "the agency . . . determine the matter as a part of the record in the case, and the determination is subject to judicial review." Regardless, Ms. Osborne had no alternative but herself, as the LAA, to review the SPC recommended decision. While we find this troublesome generally, we see no due process implication in cases of discrimination under N.C. Gen. Stat. § 150B-36 and N.C. Gen. Stat. § 126-37(b1), where the LAA will only be adopting the ALJ or SPC's findings as to their own credibility under a deferential standard, or choosing not to adopt the SPC upon a finding of discrimination. Furthermore, without a statutory alternative, necessity required Ms. Osborne to render a final agency decision. Therefore, we conclude Ms. Enoch's due process rights were not violated.

### D. *Arbitrary and Capricious Administrative Decision*

**[4]** In her final argument, Ms. Enoch contends that ALJ's decision lacked substantial evidence or was arbitrary and capricious under the whole record test. We disagree.

**ENOCH v. ALAMANCE CTY. DSS**

[164 N.C. App. 233 (2004)]

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Comr. of Insurance v. Rating Bureau,* 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977). The "arbitrary or capricious" standard is a difficult one to meet. Administrative agency decisions may be reversed as arbitrary or capricious if they are "patently in bad faith," or "whimsical" in the sense that "they indicate a lack of fair and careful consideration" or "fail to indicate 'any course of reasoning and the exercise of judgment.' " *Comr. of Insurance v. Rate Bureau,* 300 N.C. 381, 420, 269 S.E.2d 547, 573 (1980) (quoting *Board of Education v. Phillips,* 264 Ala. 603, 89 So.2d 96 (1956)).

Upon our review of the ALJ's decision, constituting 110 detailed findings of fact and 86 well-cited conclusions of law, we conclude that the recommended decision, as adopted without exception by the SPC, LAA, and the trial court, to be supported by substantial competent evidence. We hold there is a rational basis in the record to affirm a finding that Ms. Enoch lacked sufficient evidence to prove discrimination in the decision by Ms. Osborne to promote Mr. Laughlin in 2001 to the program management position.

Based on a thorough review of the briefs, record, transcripts, and exhibits, we affirm the trial court's adoption without exception of the ALJ's opinion.

Affirmed.

Judge TIMMONS-GOODSON concurs.

Judge WYNN dissents.

WYNN, Judge, dissenting.

A fair trial before an unbiased, impartial decision-maker is a basic requirement of due process. As was the case in *Hearne v. Sherman,* the instant case presents the due process problem of a final administrative determination in which the decision-maker ultimately adjudicated contested issues of fact regarding her own credibility and whether her own decision was discriminatory. As I did in *Hearne,* I continue to find that such a process flagrantly violates due process notions of fairness and impartiality, and on that basis I would reverse the decision of the trial court. Accordingly, I respectfully dissent.

Our Courts have long recognized the importance of a fair proceeding as a cornerstone of fundamental justice. *See In re*

*Murchison,* 349 U.S. 133, 136, 99 L. Ed. 942, 946 (1955) (noting that "[a] fair trial in a fair tribunal is a basic requirement of due process"); *Crump v. Bd. of Education,* 326 N.C. 603, 613, 392 S.E.2d 579, 584 (1990) (same). A vital component of a fair trial is the integrity of the procedure used to obtain a result. "Procedure must be consistent with the fundamental principles of liberty and justice." *State v. Hedgebeth,* 228 N.C. 259, 266, 45 S.E.2d 563, 568 (1947). A crucial component in insuring that a proceeding is just and in accordance with principles of fundamental fairness is the impartiality of the decision-maker. "An unbiased, impartial decision-maker is essential to due process." *Crump,* 326 N.C. at 615, 392 S.E.2d at 585.

There is an inevitable bias when a fact-finder is evaluating her own credibility.

> While the word "bias" has many connotations in general usage, the word has few specific denotations in legal terminology. Bias has been defined as "a predisposition to decide a cause or an issue in a certain way, which does not leave the mind perfectly open to conviction," *Black's Law Dictionary* 147 (5th ed. 1979) . . . . Bias can refer to preconceptions about facts, policy or law; a person, group or object; or a personal interest in the outcome of some determination.

*Id.* (citations omitted). It is fundamental that no person may sit in judgment over his or her own case. "[O]ur system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Murchison,* 349 U.S. at 136, 99 L. Ed. at 946.

In the present case, Petitioner filed a petition for a contested case hearing alleging that Osborne's decision not to promote her was based upon Petitioner's "race, her color, and her gender." Petitioner filed an affidavit of personal bias regarding Osborne, requesting that she be disqualified from the case. Petitioner also filed a motion to examine Osborne for personal bias before Osborne rendered the final agency decision. In her affidavit, Petitioner stated, *inter alia,* that Osborne had "always shown hostility toward" her, that she harbored racially discriminatory attitudes toward Petitioner, and that Osborne had given Petitioner lower evaluations because of her bias and because of media coverage of the case. In the final agency decision, Osborne rejected Petitioner's affidavit as "obvious, apparent, and self-serving" and adopted the ALJ's findings of fact and conclusions of

law determining that Petitioner failed to show that Osborne discriminated against Petitioner on the basis of race or gender or for retaliatory reasons. In doing so, Osborne was the ultimate fact-finder in a case in which her own credibility was a central issue. As such, the proceeding violated fundamental fairness and thereby North Carolina's Constitution.

This case is distinguishable from those cases where an administrative decision-maker is merely familiar with the facts of a matter. "Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not . . . disqualify a decision-maker." *Hortonville Dist. v. Hortonville Ed. Asso.*, 426 U.S. 482, 493, 49 L. Ed. 2d 1, 9 (1976). Our Supreme Court has provided guidance on distinguishing between the permissible and impermissible:

> "It is perfectly clear that the exercise of its duties by an administrative body must necessarily proceed in a different fashion from the orthodox method of administering justice in courts. . . .
>
> Nevertheless, if the administration of public affairs by administrative tribunals is to find its place within the present framework of our government it is essential that it proceed, on what may be termed its judicial side, without too violent a departure from what many generations of English-speaking people have come to regard as essential to fair play. *One of these essentials is the resolution of contested questions by an impartial and disinterested tribunal.*"

*Crump*, 326 N.C. at 619, 392 S.E.2d at 587 (quoting *Berkshire Employees Ass'n, Etc. v. National Labor R. Bd.*, 121 F.2d 235, 238-39 (3d Cir. 1941)) (emphasis added).

Here, the ultimate decision-maker adopted findings of fact and conclusions of law regarding her own credibility and her own decision not to promote Petitioner. Such a process violates our established standards of fairness, impartiality and integrity. I would find Petitioner's due process rights to have been violated, and on that ground I would reverse the decision of the trial court. Accordingly, I dissent. As noted by the majority, the decision in *Hearne* stands without precedential value. Our Supreme Court is now afforded the opportunity to provide further guidance on this troubling issue.